Moncure, P.,
after stating the case, proceeded:
There are five assignments of error in tMs case, which are as follows: 1st. “The case was one not proper for a reference to a commissioner.” 2d. “The court should have ordered an issue to be tried before a jury.” 3d. “It was error to render a decree in favor of the defendant against the plaintiff.” 4th. “The decree is erroneous, in being for interest upon the whole sum called for by the note, a part of it being interest, *390 and therefore not hearing it, such interest being compound.” And, 5th. “ The decree, upon the testimony,. ■ should have been in favor of the plaintiff, if any was rendered without a jury.”
I will consider these assignments of error in their order. But, before I do so, it seems to be proper, by way of explanation, to say something in regard to Minnie H. Kraker, wife of Meyer Kraker, and a co-plaintiff in the suit and co-appellant in the appeal. A great deal is said about her in the record; and in the earlier-period of the litigation her interest in the subject seemed to be a matter of some importance. Her husband caused the property to be conveyed to her, and the notes and deed of trust to be executed in her name; the vendor, Shields, believing that the property was conveyed to her husband, and that the notes and deed of trust were executed by him and in his name.. Shields complained that a fraud was practiced upon him in this respect; but Kraker denied that any such fraud was intended. But however that may be, it seems to be conceded by the parties, and properly so, that her rights, if she have any, and whatever they may be, are in subordination to those of Shields, to whom her husband and the property are liable for the purchase money, just as if the property had been conveyed, to him in his own name, and as if he, in his own name,, had executed the notes and deed of trust. Her name, therefore, need not be noticed, either in the statement of the ease or in this opinion, though possibly I may have occasion to refer to it again before I conclude. I. will now proceed to consider the assignments of error;; and,
1st. That “the case was one not proper for a reference to a commissioner.”
The Code, chapter 175, § 2, provides for the appointment of commissioners in chancery, but does not prescribe their particular duties, except as to taking ae *391 counts. It declares that “each court may, from time to time, appoint commissioners in chancery, or for stating accounts, who shall he removable at its plea- - sure; there shall not he more than three such commissioners in office at the same time, for the same court.” §4 declares that “every commissioner shall examine and report upon such accounts and matters as may he referred to him by any court.” The act to establish Circuit Superior courts, passed April 16th, 1831, provided that the said courts “ shall have power to appoint commissioners in chancery, not exceeding two for each court, for taking and reporting such accounts or other matters as such courts shall commit to them to be examined, stated and reported.” Sup. to B. Co. 1819, p. 164, § 76. The duties of a commissioner in chancery in this State are considered to he, generally, the same with those of a master in chancery in England, whose duties are set forth in the books of chancery practice in that country; as, for instance, in 2 Daniel’s Chancery PI. and Pr., sec. 7, pp. 1345-1503. That writer, in pointing out the course to he pursued in the Master’s office, upon the particular reference before Mm, says: “The objects, however, for which references to a Master may he made, are so numerous and various, that it would he impossible, in a treatise of this nature, specifically to detail the course of proceeding which should he adopted in each;” and he therefore confines his attention to the most usual subjects of reference, by analogy to which the proper steps to he pursued in other cases may he inferred. “Deferences to the Master upon decrees or decretal orders,” he says, “are either—1. To make enquiries; 2. -To take accounts and make computations; or, 3. To perform some special ministerial acts directed by the court. Inquiries by the Master are directed either to persons or to facts, though sometimes they are directed to matters of law; hut it is, in general, in those cases only where the law comes *392 in as a matter of fact, as in the case of an enquiry into the law of a foreign country, that the Master is ever - directed to enquire into the law; the habit of the court not being to refer abstract questions of law to the opinion of the Masters. Sometimes, however, questions of law are so mixed up with the fact to be ascertained, that it is not possible to decide upon the one, without giving an opinion as to the others. In such case, the Master is bound to give his opinion upon the law, as well as upon the matter of fact referred to him; as, in the case of a reference to a Master to enquire whether a good title can be made to'land, &c. The most usual cases in which inquiries as to persons are directed to be made by a Master, are those in which it is necessary to ascertain the heir at law or next of kin of a deceased person. The same sort of enquiry is also frequently directed for the purpose of ascertaining the individuals forming a particular class,” &c. “A similar inquiry is also necessary where it is referred to the Master to take an account of the debts due by a particular individual, such account involving, necessarily, an inquiry who the creditors are, as well as into the amount of their claims.” Id. p. 1399-1400. See also 1 Smith’s Ch. Pr., pp. 10 and 11, and 2 Id. p. 96; 1 Barbour’s Ch. Pr. 468.
The question when it is proper, or may be useful, to resort to the aid of a commissioner, is one which addresses itself to the sound discretion of the court, and as to which a large latitude of discretion must be allowed to the court; though of course the court ought to exercise such discretion soundly, to prevent unnecessary expense or delay; which seem to be the chief, if not the only evils, -of an improper reference. The court is responsible for the correct decision of the cause, and cannot shift such responsibility from its own shoulders to those of a commissioner. But it can avail itself of the assistance of a commissioner to prepare the cause and jdaee it in the best possible state to ena *393 He the court to decide it correctly. The most invaluable assistance may be afforded to the court by the agency of an intelligent, skilful, and experienced com- ■ missioner. He has often an advantage, which the court has not, in seeing and hearing the witnesses give their testimony, and being thus better able to judge of its weight. And where he acts only on the proofs already in the cause, as he often does, he may afford important aid to the court by deducing the material facts of the case from a large mass of testimony, and enabling counsel, by means of exceptions to his report, to make up and present to the court the only issues requiring its decision in the cause.
According to the foregoing principles, I do not think the Circuit court erred in referring the cause to one of its commissioners, “to 'ascertain and report whether the contract for the purchase of the real es-' tate in the bill and proceedings mentioned, according to the true understanding and agreement of the parties thereto, was to be performed in Confederate States treasury notes, and was entered into with reference to ■such notes as a standard of value; or whether the notes given by the complainant, as alleged in the bill and proceedings, for the deferred instalments of'the-purchase money of said real estate was to b.e paid, according to the true understanding and agreement of the parties, in whatever money was current at the time the said deferred instalments, respectively matured, and became due and payable;” nor in the other directions given to the commissioner, by the decree off the 8th of February, 1869. If there were any such error, it was certainly not to the prejudice of the appellant.
2d. That “ the court should have ordered an issue to be tried before a jury.”
I do not think that the casé was a proper one for an issue. There was no conflict of testimony in the case when it was referred to a commissioner. The only *394 testimony then .taken, was that of Goddin, for the plaintiff, and that of Shields and McCormick, for the - defendant. And, even after the depositions of the two Krakers, Meyer and Julius, were taken by the commissioner, there was not such a conflict in the testimony as to make an issue necessary or proper. Even where there is a conflict of evidence, it does not necessarily follow that there must be an issue; but the court-may decide the cause without one, if its conscience is satisfied. 2 Rob. Pr. old ed. 354, and cases cited. In the case of a bill? contesting the validity of a will, a court of equity is bound to have the issue which is; made up tried by a jury. But, in other cases, the: court will determine, according. to its discretion, whether it does or does not want the assistance of a-jury. Id. p. 352. Of course the court must exercise-its discretion soundly. The court may often, at it& election, direct an issue,- or refer a question to a commissioner. There are some questions which seem more properly to belong to a jury, if indeed they do-not belong exclusively to a jury, in case the conscience of the court is not satisfied; such, for example, are-questions involving fraud, or the genuineness of a. deed. Id. On the other hand, there are questions which seem more properly to belong to a commissioner, although they may be made the subjects of an issue: as, for instance, a question as to -rents and profits of land in controversy in a suit in equity. Id. 362; Green, J., in Newman v. Chapman, 2 Rand. 93, 106.
3d. That “ it was error to render a decree in favor ofi the defendant againt the plaintiff.”
It is a general rule that no person but a plaintiff can. entitle himself to a decree; but it is admitted that there are exceptions to this rule. In. a bill in equity-for an account, both parties are deemed actors, when the cause is before the court,upon.its merits; and, if a, balance is ultimately found in favor of the defendant,. *395 he is entitled to a decree for such balance against the plaintiff. 1 Story’s Eq. § 522. A plaintiff, by applying to a court of equity for an account, subjects himself to a decree for any balance which may be found due from him to the defendant.- 2 Sob. Pr. old ed. p. 405. This is not 'the only exception to the rule; but any case, falling within the same principle, is for the same reason an exception to it. This case falls within the same principle. The plaintiff might have filed his bill solely upon the ground that less than twenty days notice of the sale, as required by the deed, had been given by the trustee; and upon the admission in the answer of the fact of such defective notice, a sale under that notice would have been perpetually enjoined. Indeed, if that had been the only ground of 'the plaintiff’s complaint, he might have obtained relief without coming into court for it. The defective notice was no doubt given by inadvertence merely, as the defendants alleged; and the error would, therefore, have been corrected on request. But the plaintiff had other grounds of complaint, which would have carried him into a court of equity to stop a sale under the deed of trust, if there had been no ground of objection to the notice. He charges in his bill, “that all the notes mentioned in the said deed of trust, except the last, have been fully paid off by your orator, and he is now ready and willing to pay off the said last note at the rate of one dollar in legal tender notes for three of Confederate treasury notes; the contract for the purchase of the said real estate, according to the true understanding and agreement of the parties, was to be performed in Confederate States treasury notes, and was entered into with reference to such notes as a standard of value; and your orator is advised that, by the law of the land, he is not required to pay at a greater rate than that above mentioned.” And he prays, among other things, that the court would compel the said *396 Shields to accept the sum in legal tender notes, as above proposed, and grant such other and further re- - lief as the case might require. On the other hand, the defendant Shields, in his answer, “ denies that the contract, for the purchase of said real estate, according to the true understanding and agreement of the parties, was to he performed in Confederate States treasury notes, and was entered into with reference to such notes as a standard of value. On the contrary,” he “ charges that the true understanding and agreement of the parties was, expressly, that the said notes for the deferred instalments of purchase money were to be paid in the money current at the time the said notes respectively matured.” And he prays the court “ to adjudicate and settle the questions in controversy between ” the parties, “ as he is advised that the said questions are all of them the proper subjects of equitable jurisdiction and relief in such a case as this.” To this answer the plaintiff replied generally; and the parties, being thus at issue upon these questions, proceeded to take evidence to sustain their respective views, and the case progressed to a final decree, which turned out to be in favor of the defendant. He is entitled to the benefit of it, as he would have been bound by it, if it had turned out to be against him. Both parties invoked the decision of the court upon their controversy, which was a proper subject of equitable jurisdiction, properly brought before the court, and both ought to abide the result. “ The court,” it is said, u had no authority to render any decree, except to perpetuate the injunction, or dissolve it and dismiss the bill. The re.eord now exhibits,” it is- further said, “ the singular case of a bill dismissed, with costs, which put the case out of court, and yet a moneyed decree in favor of the defendant, with no bill or petition to sustain it.”
The true relative position of the parties to the suit *397 was reversed by the manner in which the controversy arose. The defendant was the creditor, and was in substance the plaintiff; while the nominal plaintiff was ■ the debtor, and was in substance the defendant in the suit. The court, having adjudicated the controversy and determined that the plaintiff owed to the defendant a certain sum of money and interest, properly rendered a personal decree therefor, notwithstanding the real estate for which the money was due was also liable for its payment. If any other reason were required to vindicate the propriety of such a decree, it might be found in the fact that the plaintiff caused the property to be conveyed to his wife, who may therefore be entitled to it unless the sale of it be necessary to satisfy the defendant’s demand, in case the personal decree rendered therefor should prove ineffectual in whole or in part. If it' could be said in this ease, as was said in Mettert’s adm’or v. Hagan, 18 Gratt. 231, that according to the strict rules of pleading, a cross bill was necessary, it might at least as well be said here as there, that the answer “ may, for that purpose, be treated as a cross bill, so as to enable the court to do complete justice in this cause.” The dismission of the bill was irregular. But that irregularity can easily be cured by amending the decree.
I do not think there is anything in the case of Medley v. Pannill’s adm’or, 1 Rob. R. 63, cited and relied on by the learned counsel of the appellants, to show that it was. error to render a decree in favor of the defendant against the plaintiff in this case, which is at all in conflict with what I have said .on the subject. The decision in that case was founded on peculiar circumstances which are set forth in the opinion of Judge Allen therein, and do not exist in this case.
4th. That “the decree is erroneous, in being for interest upon the whole sum called for by the note, a *398 part of it being interest, and therefore not bearing it, such interest being compound.” •
There was no agreement to pay compound interest. The interest on the deferred instalments for the time they had to run was added to the principal, and notes taken for the aggregate amounts respectively. Default having been made in the payment of the last note, the whole amount of it properly bears interest from the day it became payable. There is nothing usurious or illegal in this. In fact, the interest included in the notes is a part of the purchase money of the land, and in effect principal.
5th. That “the decree, upon the testimony, should have been in favor of the plaintiff, if any was rendered without a jury.”
The bill alleges that “the contract for the purchase of the said real estate, according to the true understanding and agreement of the parties, was to be performed in Confederate States treasury notes, and was entered into with reference to such notes as a standard of value.” The answer denies this allegation in the Very words in which it is made; and charges, on the contrary, “that the true understahding and agreement of the parties was, expressly, that the said notes for the deferred instalments of purchase money were to be paid in the money current at the time the said notes respectively matured.” If the case had stood alone upon bill and answer when the decree for a reference was made, there could have been no doubt of the defendant’s right to a decree, according to his version.of the contract. How was that right affected by the evidence which was then in the cause? But three witnesses had then been examined; one of them, Wellington Goddin, for the plaintiff, and the other two, McCormick, and Shields himself, for the defendant. God-din knew nothing about the contract, and testified *399 •chiefly as to a compromise of the third note before it' became due; which has no material bearing upon the case. But being asked by the plaintiff “When sales of real estate were made during the period mentioned,” which was from November 1, 1862, to April, 1865, “unless it was expressly understood otherwise between the buyer and seller, were or were not the deferred payments universally understood to be payable in Confederate treasury notes?” He answered, “No, sir; according to my experience, during that period, if the terms of sale required cash, Confederate treasury notes would have been received in payment, because such funds were current in all the banks of this city at that time. If the terms of sale were partly cash and partly on credit, the credit payments were to be discharged in such funds as the said banks were in the habit of receiving at the time of the maturity of such payments.” This evidence certainly supports the view taken in the answer. As to the two witnesses examined for the defendant, McCormick testified that he urged the plaintiff to buy the property, if possible, for cash; if not, on as short credit as possible; and that the plaintiff accordingly offered to pay cash, but Shields refused to sell the property for cash. The reason of the witness for giving this advice is plainly apparent, •and must have been known to the plaintiff. Witness •says he told “ him, at the same time, that the war would be over in perhaps less than two years, and Mr. Shields, •after the war, would have as much interest in the property as it would then be worth.” The defendant, •Shields, testified to the facts stated in his answer. He .said that some few months before he sold the property to the plaintiff, Mr. Latehenstein offered him $14,000 •cash for it, but he would not sell for cash. He had also an offer from Mr. Jacobs to purchase for cash, but peremptorily told him he would not sell for cash. His .reason for not selling for cash was, because money was *400 0 depreciating every day, and he expected that in a year or so, at most, he would get a better currency. He - said that the plaintiff offered to purchase from him for cash, and was very anxious for him to take it; but he refused, for the reason before mentioned. Being asked, “Did you assign any reason to Mr. Kraker for declining to take cash, and if so, what reason?” his answer was: “I think I told Mr. Kraker—am pretty certain of it— it is a long time since—that I wouldn’t sell for cash, because I thought that in a year or two the currency would be better. If he chose to take it at that risk he could do so. I wasn’t anxious to sell the property.” This testimony in behalf of the defendant also strongly sustains his answer; and the Circuit court, in that state of the case, would have been well warranted in rendering a decree against the plaintiff for the amount of the last note and interest, payable in the currency which existed at the time of its maturity. But, instead of that, the court referred the case to a commissioner; which could only have been done for the benefit, if not at the instance, of the plaintiff. Certainly, that decree was not to the prejudice of the plaintiff; though I do not mean to say that, under the circumstances of the case, it was not a proper decree.
The commissioner made a report sustaining the defendant’s claim; to which report the plaintiff excepted, and the report and exceptions were recommitted to the commissioner with directions to report the reasons for ’ his conclusions, and to take any additional evidence that might be offered by either party. The commissioner made another report under that order, giving his reasons, reaffirming his former conclusions, and returning with his report two depositions taken before him in behalf of the plaintiff, to wit, the depositions of the plaintiff himself, Meyer Kraker, and of his brother Julius. These depositions do not materially vary the case. The plaintiff testified that there was *401 no understanding about tbe kind of money in which the payments were to be made, except what was in the contract. And that when he was negotiating with Mr. Shields for the purchase of the property he did not offer to pay him in cash for it in Confederate money; though he admitted that Mr. McCormick advised him if possible, to buy the property for cash, and told him it would be a great thing for him to pay for it in cash. We have seen that both McCormick and Shields testified that the plaintiff did offer to pay cash for the property. But, however that may be, I think the decree which has been rendered against him is plainly right. The sale was made in November, 1862, at a time when Confederate money had already depreciated to two and a half for one, compared with gold, and was rapidly depreciating in value. The property was sold for $14,500, of which the sum of $4,500 was paid in cash in Confederate notes, and for the balance, $10,000, with interest from the date, negotiable notes were given, payable at one, two, three and four years after date. It was evident, from these long credits, that Shields expected that before they would all mature there would be a better currency, and intended that the notes should be payable in the money current at the time they respectively matured. And it is certain the plaintiff knew that such was the expectation and intention of Shields. For the plaintiff admits that McCormick advised him to buy the property, if possible, for cash, and told him it would be a great thing for him to' pay for it in cash. How could it be so except that by paying cash for the property he would avoid the risk of loss from an improvement in the currency before the notes, or some of them, would mature? Probably no man in the South, in November, 1862, expected the war to last four years longer. Most persons expected it to end in a much shorter time, perhaps in one or two years, and all, no doubt, believed *402 that however the war might terminate it would be followed by a better currency. The parties, in their contract, therefore, speculated upon the duration of the war and change of the currency. It turned out that the war lasted until April, 1865; longer, no doubt, than either party expected; and that Confederate money continued to be the currency of the country until the end of the war, although it rapidly depreciated in value all the time. Besides the cash payment of $4,500, which was made in Confederate money, the first two deferred instalments matured during the war, and were also paid in Confederate money, then, and especially when the second note became due on the 21st of November, 1864, reduced to a very low ebb. The last two notes, the'third and fourth, matured after the war, in November, 1865 and 1866. The third was compromised and settled more than four months before it became due, by the payment of $2,000 dollars in greenbacks, though the nominal amount of the note was $2,950. The fourth now only remains due, and is the subject of controversy in this suit. I think the plaintiff is bound to pay the amount of it, with interest from the time of its maturity, in the money which was current at that time, according to the decree of the Circuit court. It was argued that if an improvement of currency was contemplated by the parties, it was of Confederate currency, and that it could not have been expected or intended that payment should be made in Federal currency. No doubt these parties believed, as did most people in the Confederate States, that the war would terminate favorably to them, and, therefore, that any improvement which might take place in the currency would probably be of Confederate currency. But they also knew that the war might terminate otherwise; and, however it might terminate, it must have been intended by the parties, as is certainly right and proper, that the vendor should be paid *403 for Ms property by tbe vendee who enjoys it. The terms of the contract, the justice of the case and the presumed intention of the parties alike, apply to currency existing at the time of the maturity of the notes, whether it was Confederate or Federal. On this subject see what is said by this court in Boulware v. Newton, 18 Gratt. 708.
Upon the whole, I think there is no error in the decree of the Circuit court to the prejudice of the appellant. But I think there are two defects in the decree which ought to be corrected, and wMch may be corrected by an amendment. In the first place, the bill ought not to have'been dismissed, and so much of the •decree as dismisses it ought to be set aside. In the second place, the decree ought to be so amended as to reserve liberty to the defendant Shields, in case the •decree rendered in his favor against the plaintiff personally should prove ineffectual in whole or in jiart, to •apply to the court, by petition or motion in this cause, for further relief by a sale of the property for the satisfaction of the said decree, or so much thereof as may remain unpaid. I am therefore for affirming the decree, when so amended, with damages and costs.
The other judges concurred in the opinion of Mon-cure, P.
Decree amended and affirmed.